IN THE UNITED STATES COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| MONSERRATE PÉREZ-TRAVERSO, ET AL.,<br><br>Plaintiffs,<br><br>v.<br><br>HOSP. COMUNITARIO BUEN SAMARITANO, ET AL.,<br><br>Defendants. | CIV. NO.: 10-2263(SCC) |

## OPINION AND ORDER

This suit concerns the treatment of Plaintiff Monserrate Pérez-Traverso at two hospitals. On November 11, 2009, Pérez arrived at the emergency room of Hospital Comunitario Buen Samaritano ("Buen Samaritano") in Aguadilla, Puerto Rico, complaining of fatigue and phlegm. She was admitted, given some treatment, and ultimately discharged despite complaining of foot pain apparently unrelated to the condition for which she had originally sought treatment. Later on the date she was discharged from Buen Samaritano, Pérez, still in pain,

went to the emergency room of Hospital de la Concepción ("Concepción"). Pérez was discharged from Concepción early the next morning. Days later, at a different hospital, Pérez was diagnosed with an arterial thrombosis in her right foot, which resulted in gangrene and required her foot's amputation. Pérez has now sued these two hospitals, with federal jurisdiction against each predicated on claims under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd. The hospitals, however, have now filed motions for summary judgment arguing that Plaintiffs' EMTALA claims must fail. We consider that question below.

## I. Summary Judgment Standard

A motion for summary judgment will be granted "if the pleadings, the discovery and disclosure material on file, and any affidavits show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is in genuine dispute if it could be resolved in favor of either party, and it is material if it potentially affects the outcome of the case. *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004).

The movant carries the burden of establishing that there is no genuine dispute as to any material fact. *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 325 (1986). This burden may be satisfied by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations . . . or other materials." FED. R. CIV. P. 56(c)(1)(A). The movant may also point to a lack of evidence supporting the nonmovant's case. *See* FED. R. CIV. P. 56(c)(1)(B); *see also Celotex*, 477 U.S. at 325. Once the movant makes a preliminary showing that no genuine issues of material fact exist, "the nonmovant must produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy [dispute]." *Clifford v. Barnhart*, 449 F.3d 276, 280 (1st Cir. 2006) (internal quotation marks omitted); *see also* FED. R. CIV. P. 56(c)(1).

In evaluating a motion for summary judgment, we view the record in the light most favorable to the nonmovant. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

**II. Buen Samaritano's Motion for Summary Judgment**

A hospital has three distinct duties under EMTALA. Under subsection (a), "if any individual . . . comes to the emergency department" of a hospital, that hospital "must provide for an

appropriate medical screening" in order to determine "whether or not an emergency medical condition . . . exists." 42 U.S.C. § 13955dd(a). Second, under subsection (b), whenever a "hospital determines" that a person "has an emergency medical condition," the hospital must stabilize the patient. 42 U.S.C. § 1395dd(b). And third, under subsection (c), a hospital may not transfer an unstabilized patient to another institution except under specific circumstances. 42 U.S.C. § 1395dd(c).

Here, it is undisputed that Pérez was admitted to Buen Samaritano (for other reasons) by the time she reported her foot pain. Therefore, subsection (a) does not apply; the hospital is only required to screen "those individuals who present themselves at the emergency department." *Lopez-Soto v. Hawayek*, 175 F.3d 170, 173 (1st Cir. 1999). And subsection (c) does not apply either, as Pérez was not transferred to another institution. Pérez, then, may only allege a failure to stabilize claim against Buen Samaritano.

Pérez's contention in this regard is that Buen Samaritano failed to stabilize her acute arterial occlusion, which arose during her stay at the hospital. The problem with this claim, however, is that she does not even allege that Buen Samaritano's doctors *actually diagnosed* this problem; indeed,

the remainder of her claims are premised on the fact that it did not. But without evidence of an actual diagnosis of an emergency medical condition, Pérez's subsection (b) claim must fail. *See* 42 U.S.C. § 1395dd(b) (providing applicability only to those patients "the hospital *determines* . . . ha[ve] an emergency medical condition"); *see also Lopez-Soto*, 175 F.3d at 175 (holding that subsection (b) applies only if "the hospital actually detect[s] the emergency medical condition"). Without evidence that the hospital determined Pérez had an emergency medical condition, there can be no finding of EMTALA liability under subsection (b); Pérez's claim, therefore, is more correctly stated as one for mis-diagnosis, a malpractice claim that arises under state law. Accordingly, her EMTALA claim against Buen Samaritano must be dismissed. *See Kenyon v. Hosp. San Antonio, Inc.*, 951 F. Supp. 2d 255, 264 (D.P.R. 2013) (holding that subsection (b) "does not provide a cause of action when a hospital does not stabilize an emergency medical condition that it negligently failed to diagnose").

### III. Concepción's Motion for Summary Judgment

Plaintiffs' claim with regard to Concepción is that Pérez presented there with an acute arterial occlusion that went undetected because of an insufficient and discriminatory

screening process.

At around 10:00 p.m. on November 16, 2009, Pérez arrived at Concepción's emergency room. Docket No. 205, ¶ 11; Docket No. 217-1, ¶ I.11. She complained of pain in her right foot, the sole of which she said would turn cyanotic.[1] Docket No. 217-1, ¶ II.28.[2] She had a history of diabetes, hypertension, and, of course, the recent hospitalization. *Id.* Concepción did not have protocols for how to treat a patient like Pérez. *Id.* ¶ II.27. Nonetheless, Dr. Karinell Montalvo examined Pérez, but she did not observe any cyanosis. *Id.* ¶ II.31. Subsequently, however, she saw discoloration that she identified as ecchymosis.[3] *Id.* ¶ II.32. She also took Pérez's pulse in her right foot but did not compare it with Pérez's left peripheral pulse. *Id.* ¶ II.34. Taking into account Pérez's history and the observations about her condition, Dr. Montalvo performed a differen-

---

1. Cyanosis is bluish discoloration of the skin caused by lack of oxygen or insufficient blood flow. *See* Docket No. 217-1, ¶¶ 13–15.

2. Concecpción chose not to oppose any of Plaintiffs' statements of uncontested fact, and so we deem them admitted to the extent that they state facts rather than legal conclusions and are not in conflict with the admitted facts proffered by Concepción.

3. Ecchymosis looks like cyanosis, but it is caused by the accumulation of blood under the skin. *See* Docket No. 217-1, ¶ 15.

tial diagnosis in which she considered the possibility that Pérez had an acute arterial occlusion or a deep vein thrombosis. *Id.* ¶ II.35; *see also* Docket No. 204-5, at 40–43. Dr. Montalvo ordered a D-Dimer test but did not order an arterial doppler test. *Id.* ¶ II.36. D-dimer tests can help detect thrombosis, Docket No. 205, ¶ 17,[4] and plaintiffs offer no evidence that a doppler test was available at Concepción. The D-dimer test showed normal results. *See* Docket No. 204-4, at 5, 11.

Eventually, Pérez came under the care of Dr. Alexis Pereira, who spoke with Dr. Montalvo and reviewed Pérez's medical records. Docket No. 217-1, ¶ II.39. It is not clear whether Dr. Pereira compared Pérez's peripheral pulses, *id.*, but Dr. Pereira reported not seeing discoloration in Pérez's foot. *Id.* ¶ 41. Dr. Pereira gave a final diagnosis of right leg pain, neuropathic pain, and radiculopathy, and he decided to discharge her with instructions to follow up with her primary physician if the pain persisted. Docket No. 205, ¶ 20; Docket No. 217-1, ¶ I.20. At the

---

4. We reject Plaintiffs' attempts to deny this fact. They are right that the page numbers to which Concepción cites are off, but in each case they are off by a single page. Moreover, the portion of Dr. Montalvo's deposition to which Concepción refers is also cited by Plaintiffs, and so they cannot be said to have suffered any prejudice from the slight discrepancy. The fact is deemed admitted.

time, Pérez reported feeling well and her peripheral pulses were reported as "positive." Docket No. 205, ¶ 20; Docket No. 217-1, ¶ I.20. According to Plaintiffs' expert, because of how long ecchymosis takes to disappear, this probably means that the discoloration observed by Dr. Montalvo was cyanosis or ischemia, not ecchymosis. *See id.* ¶ II.43. The conditions that Concepción's physicians thought likely responsible for Pérez's pain—neuropathy and radiculopathy—don't cause cyanosis or ecchymosis. *Id.* ¶ II.44.

On these facts, we find that no failure to screen claim may survive. Over the course of more than five hours, Pérez was seen multiple times by two different doctors, who together attempted to diagnose her condition, performing physical examinations and laboratory tests to that end.[5] At the heart of

---

5. These facts alone go some way to show that Plaintiffs' EMTALA claims lack merit. EMTALA was motivated by reports of patient dumping, and it was not intended as a general federal malpractice law. *See Reynolds v. MaineGeneral Health*, 218 F.3d 78, 83 (1st Cir. 2000). Congress was first of all concerned with ensuring that "all patients who need some treatment will get a first response at minimum and will not simply be turned away." *Id.* Thus, the "fact that [Pérez] was in the hospital receiving treatment is a *prima facie* showing that the purpose" of the duty-to-screen provision "was satisfied." *Id.* Subsequent "failures of diagnosis or treatment [are] remediable under state medical malpractice law." *Id.*

Plaintiffs' case are two claims. With regard to the first—that they should have noticed that Pérez was presenting cyanosis, not ecchymosis—this is a clear case of misdiagnosis, not reachable under the EMTALA statute. The fact is that Dr. Montalvo noticed the discoloration and took it into account for the purposes of her diagnosis; that she mis-identified the symptom in the course of an emergency room exam does not transform her alleged diagnostic mistakes from negligence to EMTALA violations.[6] *See del Carmen Guadalupe v. Negron Agosto*, 299 F.3d 15, 21 (1st Cir. 2002) ("Under EMTALA the issue is not what deficiencies in the standard of emergency care contributed to a misdiagnosis."). With regard to the second—that Concepción should have ordered an arterial doppler test—Plaintiffs have failed to come forward with any evidence that such a test was available, and this is fatal to their claim in that regard. *See del Carmen Guadalupe*, 299 F.3d at 22 ("A claim

---

6. The same goes for the alleged failure of Concepción's physicians to compare Pérez's peripheral pulses. First, the doctors did undoubtedly take her pulse in the foot that was experiencing pain, and they found it to be normal. And according to Plaintiffs, the symptoms of arterial occlusion include "pulselessness," not differential pulses. *See* Docket No. 217-1, ¶ II.5. Thus, it is not apparent *why* such a comparison should have been performed—under Plaintiffs' own test, Pérez was unsymptomatic, at least according to that measure.

of inappropriate medical screening based on a failure to provide certain diagnostic tests must at least address whether the hospital was capable of performing such tests.").[7] Finally, to the extent that Plaintiffs allege Pérez's screening was disparate, they do so without even attempting to show that she "received [a] materially different screening than that provided to others in [her] condition." *Reynolds v. MaineGeneral Health*, 218 F.3d 78, 84 (1st Cir. 2000); *see also id.* ("It is not enough to proffer expert testimony as to what treatment *should* have been provided to a patient in [the plaintiff's] condition.").

We conclude, then, that the "procedures followed in the emergency room, even if they resulted in a misdiagnosis, were reasonably calculated to identify" Pérez's condition. *Del Carmen Guadalupe*, 299 F.3d at 21. Summary judgment in favor of Concepción is therefore warranted, and we dismiss Plain-

---

[7]. Relying on *del Carmen Guadalupe*, we reject Plaintiffs' argument that, to satisfy its screening duty, Concepción would have needed to transfer Pérez to a facility equipped to perform an arterial doppler study. Indeed, such a rule would conflict with EMTALA's specific text, which provides only for "an appropriate medical screening examination *within the capability of the hospital's emergency department*." 42 U.S.C. § 1395dd(a).

tiffs' EMTALA claims.[8]

### III.   Conclusion

For all of the reasons stated above, we GRANT the defendant hospitals' motions for summary judgment, Docket Nos. 202, 204, and DISMISS WITH PREJUDICE Plaintiffs' EMTALA claims. Those claims were the sole source of federal jurisdiction over this case. We decline to exercise supplemental jurisdiction over Plaintiffs' remaining state-law claims, which we DISMISS WITHOUT PREJUDICE. Judgment will be entered accordingly.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 17th day of March, 2014.

S/ SILVIA CARREÑO-COLL

UNITED STATES MAGISTRATE JUDGE

---

[8]. To the extent that Plaintiffs make a failure to stabilize claim against Concepción, it fails for the same reason as it did against Buen Samaritano: the evidence indisputably shows that the hospital did not diagnose any emergency medical condition. This is fatal to Plaintiffs' claim.